## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

    vs.                         No. CR 08-2968 MCA

**MANUEL LOPEZ-BARBA,**

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Manuel Lopez-Barba's *Motion to Suppress Evidence* [Doc. 42], filed August 31, 2009.  On October 1, 2009, the Court held an evidentiary hearing on Defendant's motion.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the motion based upon the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1.     Sergeant Nick Ramos is an 18-year veteran of the New Mexico State Police Force.  [Transcript of September 29, 2009 Suppression Hearing (hereinafter "Supp. Hrng. Tr.") at 5[1]]

2.     On December 5, 2008, Sergeant Ramos was patrolling on Interstate 40, west of Albuquerque.  [Supp. Hrng. Tr. at 6-7]

---

[1]Citations to the transcript of the suppression hearing are made to a draft transcript.  Page numbers may differ from the final document.

3.    Sergeant Ramos observed Defendant traveling 62 miles per hour in a 55 mile per hour construction zone.  [Supp. Hrng. Tr. at 8, 9]

4.    I find and accept as credible Officer Ramos's description of Defendant's speed traveling through a construction zone.

5.    Sergeant Ramos stopped Defendant in order to issue a traffic citation for speeding.  [Supp. Hrng. Tr. at 8, 11]

6.    Sergeant Ramos asked for a driver's license, registration, and proof of insurance, and Defendant provided a commercial driver's license and a rental car agreement.  [Supp. Hrng. Tr. at 10]

7.    Sergeant Ramos noticed that Defendant's hands were shaking as he handed over the documents.  [Supp. Hrng. Tr. at 10]

8.    Sergeant Ramos, as is his practice to ensure officer safety,  asked Defendant to exit the vehicle and to stand with him near the right front bumper of the police cruiser.  [Supp. Hrng. Tr. at 11]

9.    I find and accept Sergeant Ramos's testimony on this point.

10.    Once, away from Defendant's vehicle, Sergeant Ramos discussed the traffic violation with Defendant.  [Supp. Hrng. Tr. at 11]

11.    During the conversation, Defendant placed his hands in his pockets; Sergeant Ramos asked Defendant to remove his hands from his pockets and Defendant then admitted that he had a knife in his pocket.  [Supp. Hrng. Tr. at 13]

12.    Sergeant Ramos conducted a pat-down search of Defendant and immediately felt a hard cylindrical object in one of Defendant's pockets, which was a bit bigger than a lipstick tube. [Supp. Hrng. Tr. at 14, 54]

13.     Sergeant Ramos asked Defendant to identify the object and Defendant stated that those were his pills.  [Supp. Hrng. Tr. at 23]

14.     I find that Sergeant Ramos credibly testified that he was unsure about the nature of the cylindrical object and that he could not be sure that it was not a weapon.

15.     Sergeant Ramos asked Defendant for permission to remove the object, and Defendant refused, but he offered to empty his pockets for the Sergeant.  [Supp. Hrng. Tr. at 15]

16.     Sergeant Ramos told him to wait, and after finishing the pat-down search and after recovering the knife, Sergeant Ramos permitted Defendant to empty his pockets.  [Supp. Hrng. Tr 15]

17.     Defendant removed the objects from his right front pocket, and when he showed his hands to Sergeant Ramos, the left hand was holding paper and money and the right hand was curled underneath the left so that Sergeant Ramos could not see what was in the right hand.  [Supp. Hrng. Tr. 15-16]

18.     Sergeant Ramos pointed to Defendant's right hand and asked, "what's in your right hand." [Supp. Hrng. Tr. at 16]

19.     I find and accept as credible Sergeant Ramos's description of his interaction with Defendant until this point.

20.     Defendant began to back away, and Sergeant Ramos testified that he believed Defendant was attempting to flee.  [Supp. Hrng. Tr. at 18]

21.     A video camera is mounted on the top of Sergeant Ramos's patrol unit.

22.     Sergeant Ramos testified—and the video tape confirms—that he reached out, grabbed Defendant's right arm, and braced him against the police cruiser.  [Supp. Hrng. Tr. at 18; Ex 4]

23.     Sergeant Ramos testified that he then noticed that Defendant's right hand was empty and that his left hand was curled by his mouth.  [Supp. Hrng. Tr. at 19]

24.     Although it is apparent from the video that Defendant's left has not curled by his mouth, I find and accept as credible Sergeant Ramos's testimony that he believed that Defendant's hand was curled by his mount because from Sergeant Ramos's perspective, standing behind Defendant, it could have appeared that way.

25.     Sergeant Ramos believed that Defendant was trying to swallow something, and Sergeant Ramos attempted to choke Defendant to prevent him from swallowing.  [Supp. Hrng. Tr. at 21]

26.     I find Sergeant Ramos's testimony to be credible on this point.

27.     Officer Arsenio Chavez has with the New Mexico State Police for nine years and is a K-9 Handler.  [Supp. Hrng. Tr. at 5-565]

28.     Officer Chavez was also patrolling I-40 West on December 5, 2008, looking for traffic violations with his assigned K-9, Chica.  [Supp. Hrng. Tr. at 57]

29.     Officer Chavez observed Sergeant Ramos engaged in a traffic stop on the opposite side of the road.  [Supp. Hrng. Tr. at 57-58]

30.     Officer Chavez watched the interaction between Sergeant Ramos and Defendant, and when he saw what he believed to be an altercation, he crossed the lanes of traffic to assist.  [Supp. Hrng. Tr. at 58]

31.     I find and accept as credible Officer Chavez's testimony regarding his observations.

32.     With the help of Officer Chavez, Sergeant Ramos handcuffed Defendant.  [Supp. Hrng. Tr. at 22, 58]

33.     Sergeant Ramos retrieved the cylindrical object from Defendant's left shirt pocket.  [Supp.

Hrng. Tr. at 23]

34.    In order to ensure Defendant's safety and to anticipate a possible overdose, Sergeant Ramos opened the cylindrical container.  [Supp. Hrng. Tr. 23-24, 43]

35.    I find that it was reasonable for Sergeant Ramos to believe that Defendant might have ingested medicine and be in danger of an overdose.

36.    The container held small shards of a crystalline substance, which Sergeant Ramos, based on his training and experience, identified as crystal methamphetamine.  [Supp. Hrng. Tr. at 31]

37.    After the arrest, Officer Chavez ran Chica around Defendant's car, and Chica alerted to the trunk area on the first approach.  Officer Chavez ran Chica around the car three times. [Supp. Hrng. Tr. at 59, 72]

38.    Sergeant Ramos, Officer Chavez, and a third officer searched the front, back, trunk, and engine area of the car.  [Supp. Hrng. Tr. at 26-27]

39.    Officer Chavez alerted Sergeant Ramos that the spare tire looked unusual, and on closer inspection, Sergeant Ramos also noticed that the spare tire had glue at the seam between the rubber and the metallic rim that is not normally on a spare tire.  [Supp. Hrng. Tr. at 27]

40.    Sergeant Ramos felt the tire, and it was soft and it felt as if there were objects inside.  [Supp. Hrng. Tran. at 28]

41.    In Sergeant Ramos's experience, spare tires are used to transport narcotics.  [Supp. Hrng. Tran. at 29]

42.    Sergeant Ramos deflated the tire and observed objects inside the tire, but he could not pull the tire open at the seam, and as a result, he had to cut the tire open.  [Supp. Hrng. Tran. at 29, 30]

43.    Inside the tire, Sergeant Ramos observed packages wrapped in packing tape.  [Supp. Hrng.

Tran. at 30]

44. Sergeant Ramos removed and cut open a package, and identified what he believed to be crystal methamphetamine.  [Supp. Hrng. Tran. at 30-31]

45. Officer Chavez ran Chica by the spare tire, and she indicated to the tire.  [Supp. Hrng. Tran. at 51, 69]

46. Sergeant Ramos left the rest of the packages in the tire, replaced the spare tire in the car, and had the car towed to the New Mexico State Police Headquarters.  [Supp. Hrng. Tran. at 32]

47. I find Sergeant Ramos's testimony on these points to be credible.

48. Jeffrey Mauldin is a special agent with the Drug Enforcement Administration and has been with the DEA for five years.  [Supp. Hrng. Tr. at 73]

49. As duty agent on December 5, 2008, Agent Mauldin received a call about a possible narcotics offense, and he and Agent Stark went to the New Mexio State Police Headquarters in order to investigate.  [Supp. Hrng. Tr. at 74-75]

50. Agents Mauldin and Stark  met Sergeant Ramos and Officer Chavez, and together they found in the spare tire, several packages of what field tests determined to be methamphetamine.  [Supp. Hrng. Tr. at 75, 86]

51. Agent Mauldin interviewed Defendant.  [Supp. Hrng. Tr. at 76]

52. Agent Mauldin began the interview by reading Defendant his rights.  [Ex. 5 at :06; Supp. Hrng. Tr. at 77]

53. Defendant asked if he could have his wallet, and Agent Mauldin permitted Defendant to retrieve his wallet, from which Defendant removed a Miranda card.  [Ex 5 at :06, Supp. Hrng. Tr. at 78-79]

54. I find Agent Mauldin's testimony to be credible in this regard.

55.   Despite Agent Mauldin's testimony that he thought it was unusual that Defendant carried a <u>Miranda</u> card in his wallet, [Supp. Hrng. Tr. at 79] I find that Defendant's possession of a <u>Miranda</u> card carries no inference of guilt or reason to suspect wrong doing.

56.   Agent Mauldin provided Defendant with an Advice of Rights form and asked Defendant if he understood and read English, to which Defendant responded in the affirmative.  [Ex. 5 at :06]

57.   Defendant initialed by each statement on the Advice of Rights form.  [Supp. Hrng. Tr. at 81] Before initialing the last paragraph and signing a waiver of rights, Defendant asked for clarification.  [Ex. 5 at 3:13]

58.   Agent Mauldin answered Defendant's questions and asked "Will you answer some questions for us?"  [Ex. 5 at 3:22-4:07]

59.   Defendant responded "Well, um, first of all, I know I'm going to need a lawyer.  Because of the way everything's been—is going—is being set up on me you know since I woke up this morning on the road and it's like it's going to be hard for me to—especially with what was given to me in that little jar that I you know should have never have taken.  And second of all what was in that spare tire that I did not know—you know—I was—Third of all—."  [Ex. 5 at 4:08-4:48]

60.   Agent Mauldin interrupted  and asked again whether Defendant to talk without a lawyer present.  [Ex. 5 at 4:50-5:09]

61.   Defendant expressed uncertainty, and Agent Mauldin told Defendant what sort of information he was interested in receiving, [Ex. 5 at 5:31-3:39] encouraging Defendant to talk with statements like "The more you tell us and the more honest you are with us, the more that helps you by helping us."  [Ex. 5 at 5:49-5:55]

62.   Agent Mauldin also stated that "I cannot and will not promise you anything." [Ex. 5 at 6:30-6:34]

63.   Defendant continued to express uncertainty about his ability to help. [Ex. 5 at 7:09-8:33]

64.   Agent Stark then stated "While you think about it, let's just get some basic stuff out of the way," and the agents asked Defendant a series of biographical questions about his identity, address, workplace, and family. [Ex. 5 at 8:34-15:17]

65.   Agent Mauldin then asked Defendant: "Back to our original question, here, do you want to talk to us now? Right now you get the most bang for your buck. You're going to want to tell us what happened in like two weeks to a month. But that information by then won't be useful to me, ok? So you'll get credit for talking to me then, but it's not really going to help me. If you want the most—the most consideration, and I can't promise what that'll be, 'cause it's not my decision, but if you want the most help in getting—the most help in this situation, it's best for you to talk to me now. Does that makes sense?" [Ex. 5 at 15:16-16:01]

66.   Defendant responded "I'll help you–you know, I'll answer the best I can." [Ex. 5 at 16:03-16:08]

67.   Agent Mauldin again clarified: "Okay, so, do you want to talk to us now without a lawyer? I guess is my question. . . . If you do, sign there, and just say yes, I don't want a lawyer right now. [Ex. 5 at 16:09-16:20]

68.   Defendant signed and dated the form. [Ex. 3]

69.   The interview proceeded, and Agents Mauldin and Stark asked Defendant a number of questions about the drugs, the tire, and the events leading up to his arrest. [Ex. 5 at 17:07-50:29]

70.    Almost an hour into the interview, Defendant said "I want to talk to an attorney." [Ex. 5 at 51:53]

71.    The agents ended the interview and explained to Defendant what would happen next. [Ex. 5 at 52:00-57:30]

72.    Defendant was charged by Indictment with possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1). [Doc 13]

## II.  LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On August 31, 2009, Defendant filed a *Motion to Suppress Evidence*, [Doc 42] by which he seeks to exclude the physical evidence resulting from search of the car as well as any statements made by Defendant to Agent Mauldin during the interview. [Doc 42 at 1]  In support of his motion to suppress the physical evidence, Defendant contends that the initial stop was unjustified, that the detention was impermissibly extended, that Sergeant Ramos had no basis for opening the cylindrical container, that Sergeant Ramos did not have probable cause to arrest Defendant, and that the search of the car was an improper search incident to arrest. [Doc 42 at 5, 8; Doc 52 at 2]  The Government counters by arguing that the initial stop was justified by Agent Ramos's observation of Defendant driving 62 miles per hour in a 55 mile per hour zone. [Doc 44 at 1, 5]  The Government also contends that Sergeant Ramos's subsequent searches of Defendant's person and car were sufficiently limited in time and scope to be permissible, [Doc 44 at 5] that the opening of the container was justified by exigent circumstances, [Doc 51 at 4] that Defendant's arrest was supported by the illegal contents of the container, [Doc 51 at 5] and that the search of the car was based on probable cause stemming from the positive alert from the drug-sniffing dog. [Doc 44 at 9]

Defendant additionally argues that his statements should be suppressed because Agent Mauldin failed to administer the warnings pursuant to Miranda v. Arizona, 384 U.S. 436 [Id]; Agent

Mauldin failed to discontinue interrogation after Defendant unambiguously invoked his right to counsel [id]; and any waiver by Defendant of his Miranda rights was not knowing and voluntary. [Doc 42 at 12, 14]   The Government first asserts that it does not intend to use Defendant's statements as evidence at trial—apart from reserving the right to use the statements in cross examination.   [Doc 44 at 12, 20]   Nevertheless, the Government disputes Defendant's factual recitation of the interview, [id] and argues that Defendant was informed of his Miranda rights, [id] that Defendant did not unambiguously invoke his right to an attorney, [id] and that Defendant validly waived his right to remain silent.   [Doc 44 at 18]

### A.  Fourth Amendment Violations

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief."   United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (*quoting* Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception and second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  See Hunnicutt, 135 F.3d at 1348.

A traffic stop is "justified at its inception" when the initiating officer had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] ocurring."  Id. at 1348.  During the course of a lawful investigatory stop, a police officer "may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'"  Arizona v. Johnson, 129 S.Ct. 781, 786 (2009) (*quoting* Pennsylvania v. Mimms, 434 U.S. 106, 111, n. 6 (1977)).  The officer additionally has the authority to frisk—pat down for weapons—the occupants of a vehicle if the officer reasonably suspects that they are armed and

dangerous.  Johnson, 129 S.Ct. at 784.  A law enforcement officer may not, however, open containers unless (1) he has secured a warrant, (2) some exception to the warrant requirement applies, or (3) he reasonably believes that the container contains a weapon.  See Horton v. California, 496 U.S. 128, 142, n.11 (1990) (discussing an item seized under the  plain view exception and observing that "[e]ven if the item is a container, its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant or one of the well-delineated exceptions to the warrant requirement." (internal citations omitted)); United States v. Brakeman, 475 F.3d 1206, 1212-13 (10th Cir. 2007) (permitting law enforcement to open a glasses case located during a weapons search because the case could have contained weapons).

In order to investigate a perceived traffic violation, the officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation.  See United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).  Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity or (2) the driver consents to additional questioning.  Id.  "When determining whether there was reasonable suspicion, a court must look to the 'totality of the circumstances' to see whether the officer had a 'particularized and objective basis for suspecting legal wrongdoing.'"  United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  In the event that further detention is permissible based on fresh suspicion, the use of a drug detection dog "that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."  Illinois v. Caballes, 543 U.S. 405, 410 (2005). 410.  Further, should the dog give a positive alert, the officer has probable cause to search the vehicle.  United States v.

Rosborough, 366 F.3d 1145, 1153  (10th Cir. 2004).

### 1.    The Stop

Defendant was traveling at 62 miles per hour in a 55 miler per hour construction zone, which constitutes a traffic violation.  See NMSA 1978, § 66-7-301(A)(4) (2002).  Accordingly, Sergeant Ramos had reasonable suspicion to stop Defendant for a traffic violation.  See United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.").

The parties dispute Sergeant Ramos's reasons for asking Defendant to exit the vehicle. Defendant contends that Sergeant Ramos noticed Defendant's hands shaking and "decided to prolong [the] detention."  [Doc 42 at 7]  Sergeant Ramos' testimony at the suppression hearing supports the Government's assertion that he wanted to conduct the traffic stop in a secure environment.  [Supp. Hrgn. Tr. at 11; Doc 44 at 8]  In addition, Sergeant Ramos did not ask Defendant to leave the vehicle in order to expand the scope of the stop—once Defendant was standing outside, Sergeant Ramos continued to investigate the speeding violation.  [Supp. Hrgn. Tr. at 13]  Because the stop was lawful and at the time Sergeant Ramos requested Defendant to exit the vehicle, the investigation was limited to speeding, the request for Defendant to exit his vehicle did not violate the Fourth Amendment.  See Johnson, 129 S.Ct. at 784 (explaining that during the course of a lawful investigatory stop, a police officer "may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.").

### 2.    The Frisk

Defendant contends that Sergeant Ramos's pat-down search was an expansion of the original detention and that Sergeant Ramos justified the search based solely on Defendant's shaking hands.

[Doc 42 at 7]  Defendant does not deny that he told Sergeant Ramos that he was carrying a knife or that Sergeant Ramos conducted the pat-down search after this admission.  [Doc 42 at 3]  Thus, Sergeant Ramos reasonably suspected that Defendant was armed and the search of Defendant's person was to ensure safety.  Accordingly, the search of Defendant's person was justified by Defendant's admission that he was carrying a weapon.  See id. ("To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.").

### 3.      The Container

Although an officer normally may not open a container without a warrant, such an action can be justified by the application of a well-established exception to the warrant requirement.  See Horton, 496 U.S. at 142, ("Even if the item is a container, its seizure does not compromise the interest in preserving the privacy of its contents because it may only be opened pursuant to either a search warrant or one of the well-delineated exceptions to the warrant requirement." (internal citations omitted)).  It is well established that a warrant is not required where "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks and citation omitted).  "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."  Id.

In the present case, it is undisputed that Sergeant Ramos opened the cylindrical object without a warrant and without Defendant's consent.  [Supp. Hrng. Tr. at 43]  Nevertheless, the opening of the container was justified by Sergeant Ramos's objectively reasonable belief that Defendant was possibly in danger of a drug overdose.  At the suppression hearing, Sergeant Ramos

testified that when he initially felt the cylindrical object in Defendant's pocket and asked Defendant

what it was, Defendant told Sergeant Ramos that those were his pills.  [Supp. Hrng. Tr. at 23]

Defendant later removed the cylindrical object from his pocket with his right hand.  [Supp. Hrng.

Tr. at 17]  After bracing Defendant against the police cruiser and securing Defendant's right hand,

Sergeant Ramos noticed that the right hand that had held the cylindrical object was now empty, that

Defendant's left hand was obscured from view[2], and that Defendant's head was down.  [Supp Hrng.

Tr. at 18, 19]  Sergeant Ramos testified that he believed Defendant was trying to swallow

something.  [Supp. Hrng. Tr. at 21]

At that point, Sergeant Ramos "reached over the top" of Defendant  because he "wanted to

choke him to keep him from swallowing any objects."  [Id]  When asked why he took this action,

Sergeant Ramos explained, "Well, for his safety."  [Id]  On cross examination, Sergeant Ramos

elaborated further:

> [I]t's not just looking for narcotics.  He can overdose just by ingesting too much
> regular medicine that he's supposed to either have or not have or didn't have a
> prescription when you talk narcotics, so it may be a legal drug that somebody can
> have, maybe he wasn't supposed to—just wasn't supposed to have it.

[Supp. Hrng. Tr. at 43]  Based on these facts, this Court finds that Sergeant Ramos reasonably

opened the container to ensure Defendant's safety—to determine whether Defendant had ingested

---

[2]  Sergeant Ramos testified that Defendant's left hand was "tucked up tight towards his
chin because his—his hand [was] bent down, so I know his—his—his hand is close to his
mouth."  [Supp. Hrng. Tr. at 20]  The video recording of the stop does not support this statement,
however, the camera was facing Defendant.  This Court evaluates the objective facts known to
the officer.  See United States v. Cuaron, 700 F.2d 582, 586 (10th Cir. 1983) (evaluating exigent
circumstances according to "the realities of the situation presented by the record" and to how
they "would have appeared to prudent, cautious, and trained officers" (internal quotation marks
and citation omitted)).  Sergeant Ramos's perspective was from behind Defendant.  Thus,
although Sergeant Ramos drew a conclusion that was ultimately not supported by the
video—that the left hand was near Defendant's face—his testimony credibly described the
events from his physical perspective.

the bottle's contents and whether Defendant was in danger of overdose.  See id., 547 U.S. at 404

("An action is reasonable under the Fourth Amendment, regardless of the individual officer's state

of mind, as long as the circumstances, viewed objectively, justify [the] action." (alteration in

original) (internal quotation marks and citation omitted)); see also Winchester v. Cosaineau, 404

F.Supp.2d 1262, 1268 (D.Colo. 2005) (holding that where the officers had a substantiated,

reasonable belief that someone inside a home was in need of immediate medical aid or dying,

exigent circumstances justified the warrantless entry into the home).

### 4.   The Arrest

Defendant argues that Sergeant Ramos's actions resulted in an illegal arrest.  [Doc 52 at 1]

Specifically, Defendant contends that he was under arrest at the time that he moved away from

Sergeant Ramos and that Sergeant Ramos did not have probable cause to make an arrest at that time.

[Doc 52 at 2]   Defendant's argument is based largely on Sergeant Ramos's testimony at the

suppression hearing, in which he stated that he thought Defendant was trying to run away and that

after Defendant was restrained, he was under arrest for attempting to flee.  [Doc 52 at 2; Supp. Hrng.

Tr. at 41]

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where

there is probable cause to believe that a criminal offense has been or is being committed."

Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  "Whether probable cause exists depends upon the

reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the

arrest."   Id.   Thus, the arresting officer's subjective intentions are irrelevant as long as "the

circumstances, viewed objectively, justify [the action taken]."   Id.   For these reasons, the Court

concludes that whether Sergeant Ramos thought that Defendant was under arrest at the time that he

was restrained is irrelevant.   Instead, the analysis requires consideration of whether Sergeant

Ramos's actions—grabbing Defendant, bracing him against the car, and handcuffing him—elevated the encounter into an arrest requiring probable cause or whether those actions were necessary in order to protect personal safety and maintain the status quo during the stop.  See United States v. Albert, 579 F.3d 1188, 1193 (10th Cir. 2009).

At the time that Sergeant Ramos restrained Defendant against the car, he had the following information:  Defendant had a knife in his pocket, Defendant had a second unknown object in another pocket,  Defendant had admitted that there were pills inside the object, Defendant attempted to conceal the object, and Defendant backed away when Sergeant Ramos asked a question about the object.  Defendant contends that Sergeant Ramos "admitted he knew [the object] was not a weapon," [Doc 52 at 4] however, this is a misstatement of the Sergeant's testimony.  At the suppression hearing, Sergeant Ramos explained that the object "was not readily identifiable to [him] as not being a weapon."  [Supp. Hrng. Tr. at 37]  Under the circumstances, Sergeant Ramos could not be sure whether the cylindrical object in Defendant's hand was another weapon.  Accordingly, Sergeant Ramos's actions were reasonably necessary to ensure his personal safety and his actions therefore did not need to be justified by probable cause.  See id. (explaining that the courts avoid "unrealistic second-guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones" (internal quotation marks and citation omitted)).

## 5.    The Search

Finally, Defendant challenges the search of the vehicle on two bases:  (1) it was a further unjustified expansion of the traffic stop and (2) it was an improper search incident to arrest.  [Doc 42 at 7-8]  With regard to the first point, as noted earlier, a motorist may be further detained if the officer has a reasonable suspicion that the driver is engaged in criminal activity.  See Gregoire, 425

F.3d at 879.  Sergeant Ramos testified that while discussing the traffic violation, Defendant admitted

that that he was carrying a weapon.  [Supp. Hrng. Tr. at 13]  This admission led to a protective frisk,

which produced the cylindrical object.  [Supp. Hrng. Tr. at 14]  After a brief struggle, Sergeant

Ramos recovered the cylindrical object from Defendant, opened the container, and discovered that

it contained what appeared to be contraband.  [Supp. Hrng. Tr. at 23, 31]  A drug detection dog then

sniffed Defendant's car, and after a positive alert, the car was searched.  [Supp. Hrng. Tr. at 25, 26]

Based on Sergeant Ramos's testimony, during the course of investigating the traffic stop, he

developed reasonable suspicion that Defendant was engaged in criminal activity apart from the

speeding violation.  See United States v. Lyons, 510 F.3d 1225, 1238 (10th Cir. 2007) (holding that

once the officer developed reasonable suspicion of further criminal activity, continued detention "to

facilitate further investigation of those suspicions was permissible").  Accordingly, the search of the

vehicle was not an unjustified expansion of the original traffic stop, but instead the result of fresh

suspicion of further criminal activity.

Defendant's second argument is that the search of the car was an improper search incident

to arrest, contrary to Arizona v. Gant, 129 S.Ct. 1710 (2009).  [Doc 42 at 7-8]  Gant held that

arresting officers cannot perform a valid search incident to arrest of a car when the arrestee has been

handcuffed and is secured in the back of a police cruiser.  Id. at 1714.  In Gant, the defendant was

arrested on an outstanding warrant for driving with a suspended license.  Id. at 1714-15.  The

officers conducted the arrest after the defendant had gotten out of his car and walked toward the

officers.  Id. at 1715.  After the defendant was locked in the back of a police vehicle, the arresting

officers conducted a search of the car that the defendant had exited and discovered contraband.  Id.

The Supreme Court of the United States concluded that the search of the car was not a proper search

incident to arrest because police are authorized "to search a vehicle incident to a recent occupant's

arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Id. at 1714, 19.

The Government counters Defendant's challenge by casting the search of the car not as a search incident to arrest, but as the "result of a positive alert by a drug sniffing canine which independently establish probable cause." [Doc 44 at 9]  Despite the apparent factual similarity to Gant—both defendants were secured in the police cruiser at the time of the search—the present case is distinguishable.  In Gant, the defendant arrived, parked his car, got out, and approached the officers who were present on the scene.  Id. 1715.  The defendant was immediately arrested for driving without a license.  Id.  The arresting officers did not establish fresh suspicion of additional illegal activity; the only basis for the search was the defendant's arrest.  As explained earlier, Sergeant Ramos developed fresh suspicion of additional illegal activity, and as a result, Defendant's further detention and the subsequent search were justified by the totality of the circumstances. Williams, 403 F.3d at 1207.

Because the further detention was justified, the use of the drug-sniffing dog was not a constitutional violation.  See Caballes, 543 U.S. at 408 ("[C]onducting a dog sniff [does] not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner.").  Defendant argues (1) that the Government failed to sufficiently establish Chica's reliability and record [Doc 52 at 5] and (2) that Chica made only a "general alert," which "did not add anything to support probable cause that there" were drugs in the car. [Doc 52 at 6]  The Court is unpersuaded.  First, "[a]s the party seeking to suppress the evidence, [the defendant] bears the burden of proving the dog is unqualified."  United States v. Parada, 577 F.3d 1275, 1283 (10th Cir. 2009).  In his motion, Defendant attempts to shift this burden to the Government.  [Doc 52 at 5] Defendant offered no evidence that Chica is unreliable or inaccurate.

Second, the Tenth Circuit Court of Appeals has held that "a dog's alert to the presence of contraband is sufficient to provide probable cause." Parada, 577 F.3d at 1282. Thus, it was not necessary for Chica to specifically indicate that there were drugs in a particular area of the car—a general alert to the car was sufficient to establish probable cause. Accordingly, Chica's alert to the car provided the officers with probable cause to search the entire vehicle. See id. at 1283 ("[A] dog alert creates general probable cause to search a vehicle; it does not implicate the precision of a surgeon working with scalpel in hand." quoting Rosborough, 366 F.3d at 1153).

### B.    Fifth Amendment Violations

Next, Defendant argues that the interviewing agents violated his Fifth Amendment rights to counsel and to avoid self incrimination.  [Doc 42 at 10]  It is well established that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444.  Those procedural safeguards are such that "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.  Before Miranda even is applicable, two requirements must be satisfied: (1) the suspect must be "in custody;" and (2) the questioning must meet the legal definition of "interrogation." United States v. Bennett, 329 F.3d 769, 774 (10th Cir. 2003).

The parties raise no issue regarding whether Defendant was in custody; the interview took place at the New Mexico State Police investigations office following Defendant's arrest.  [Doc 42 at 3]  In addition, although Defendant appears to dispute whether he was advised of his Miranda rights, [Doc 42 at 10] he sets forth in the fact section of his briefing that "Agent Maudlin began by reciting [Defendant's] Miranda rights" [Doc 42 at 3] and this is supported by the audio recording

of the interview, as well as Agent Mauldin's testimony.  [Ex. 5 at :06; Supp. Hrng. Tr. at 77]

**1.      Invocation of Right to Counsel**

Defendant contends that Agent Mauldin disregarded an unambiguous invocation of the right to counsel.  [Doc 42 at 10]  If a defendant invokes the right to counsel, questioning by law enforcement officers must immediately cease.  <u>Davis v. United States</u>, 512 U.S. 452, 454 (1994).  "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning."  <u>Id.</u> at 459 (emphasis in original).  Agent Mauldin testified, and the audio recording supports, that Defendant did not request a lawyer at the start of the interview but instead asked for his wallet in order to retrieve his own <u>Miranda</u> card.  [Supp. Hrng. Tr. at Ex. 5 at 78-79]

Although Defendant does not specifically allude to another invocation, the Government points to an additional statement that could be construed as an invocation of the right to an attorney.  [Doc 44 at 14]  After Agent Mauldin advised Defendant of his <u>Miranda</u> rights and asked Defendant if he would answer some questions, Defendant said, "Well, um, first of all, I know I'm going to need a lawyer because of the everything's been . . . is going, is being set up, on me you know, since I woke up this morning, on the road . . . "  [Ex. 5 at 4:07]  Defendant continued to talk about the situation until Agent Mauldin interrupted and tried to clarify whether Defendant was invoking his right to an attorney.  [Id]  In response, Defendant did not mention an attorney, but continued to talk about what had happened.  [Id]  Eventually—as the Government concedes—Defendant made a statement that unambiguously invoked his right to an attorney, and Agent Mauldin terminated the interview.  [Ex. 5 at 51:55]

Defendant's remark, "I know I'm going to need a lawyer," as a preface to an explanation of

the events that led to his arrest, is insufficient to have required Agent Mauldin to cease questioning under <u>Davis</u>.  Defendant did not request an attorney, but instead spoke of his intention to retain one in the future.  In no way did Defendant indicate that he wished to consult with an attorney before speaking to Agents Mauldin and Stark.  <u>See Miranda</u>, 384 U.S. at 445 (explaining that questioning must cease if the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking").  Accordingly, Defendant failed—at that point—to unambiguously invoke his right to counsel.  <u>See Davis</u>, 512 U.S. at 462 ("Unless the suspect actually requests an attorney, questioning may continue.").

### 2. Waiver of Rights

A defendant may waive his <u>Miranda</u> rights, "provided the waiver is made voluntarily, knowingly and intelligently."  <u>Miranda</u>, 384 U.S. at 444.  Whether a defendant has waived his <u>Miranda</u> rights "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  <u>United States v. Burson</u>, 531 F.3d 1254, 1256 (10th Cir. 2008) (internal quotation marks and citation omitted).  Waiver in this context is a two-part inquiry:  (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2)  "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1989) (internal quotation marks and citation omitted).  "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Id.</u> (internal quotation marks and citation omitted).

### a. Knowing Waiver

Defendant claims that his statements were not knowingly made because he "believed that he had already asserted his right to speak to counsel, yet the agents ignored his request and insisted that it was in his best interest to speak to them now." [Doc 42 at 13]  As noted above, the standard for a "knowing" waiver is whether the defendant had "full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Spring, 479 U.S. at 573. Prior to interviewing Defendant, Agent Mauldin established that Defendant understood English. [Ex. 5 at :06]  In addition, Defendant was read his rights by Agent Mauldin, [Supp. Hrng. Tr. at 77] Defendant had access to his own Advice of Rights card, [Supp. Hrng. Tr. at 78] and Defendant signed a New Mexico State Police Advice of Rights form.  [Supp. Hrng. Tr. at 81-83]  In addition, Defendant asked a question about the Advice of Rights form, which was answered by Agent Mauldin.  [Ex. 5 at 3:13]  Based on the totality of the circumstances, Defendant's constitutional rights were explained to him, and he understood the explanation.  Accordingly, he executed a knowing waiver.

## b.   **Voluntary Waiver**

Defendant also contends that any waiver of rights was not voluntary because the interrogating agents "effectively told [Defendant] that he would be penalized if he exercised rights guaranteed to him under the Constitution of the United States."  [Doc 42 at 15]  A waiver is involuntary only if the interrogating agent "took unfair advantage of [the] defendant's traits or the surrounding circumstances."  United States v. Lamy, 521 F.3d 1257, 1261 (10th Cir. 2008) (alteration in original) (internal quotation marks and citation omitted).  The relevant factors include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment."  Id. at 1262.

Defendant challenges only the nature of Agent Mauldin's questions.  Defendant argues that because he requested an attorney and did not understand the Advice of Rights form, the agents' "continued persistence and improper statements" rendered any statement by Defendant involuntary. The Government contends that Agent Mauldin's statements were designed to steer "the conversation away from the subject of the methamphetamine and to the issue of whether Defendant was speaking voluntarily."   [Doc 44 at 19]   The Court has already determined that Defendant did not unambiguously request an attorney, and Defendant provides few facts to establish that Agent Mauldin took unfair advantage of Defendant or the situation.  See Colorado v. Connelly, 479 U.S. 157, 170 (1986) ("The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching . . . .").

Defendant suggests that Agent Mauldin employed coercive tactics by telling Defendant that he could help himself by talking to the agents and that Defendant would have to "take whatever comes" if he did not talk to the agents, that "right now [he would] get the most bang for his buck," and that if Defendant wanted "the most help in this situation, it's best for [him] to talk . . . now." [DOC 42 at 4, 15]  The Tenth Circuit has held that this sort of language does not necessarily render a waiver involuntary.  See United States v. Roman-Zarate, 115 F.3d 778, 784 (10th Cir. 1997) (concluding that although the interrogating agent " exercised his right to manipulate the encounter with [the defendant], his actions were not so extraordinary as to have deprived [the defendant] of his ability to make a rational choice" and that the defendant's "statements were the product of his own free will").

To the contrary, Agent Mauldin repeatedly attempted to clarify whether Defendant wanted an attorney. [Supp. Hrng. Tr. at 80-81]  Over fifteen minutes into the interview, Defendant still had not decided whether to speak to the agents and Agent Maudlin steered the interview back to that

subject:

> Back to our original question, here.  Do you want to talk to us now?  Right now you get the most bang for your buck.  You're going to want to tell us what happened in like two weeks to a month.  but that information by then won't be useful to me.  Ok?  So you'll get credit for talking to me then, but it's not really going to help me.  If you want the most—the most consideration, and I can't promise what that'll be, 'cause it's not my decision, but if you want the most help in getting—the most help in this situation, it's best for you to talk to me now.  Does that makes sense?

[Ex. 5 at 15:17]  Defendant responded "I'll help you—you know, I'll answer the best I can."  [Ex. 5 at 16:03-16:08]  Again, Agent Mauldin asked for clarification:  "Okay, so, do you want to talk to us now without a lawyer?  I guess is my question. . . . If you do, sign there, and just say yes, I don't want a lawyer right now.  [Ex. 5 at 16:09-16:20]  At that point, Defendant signed and dated the form.  [Ex. 3]  Based on this evidence, the Court concludes that Defendant's will was not overborne by Agent Mauldin and that his statements were voluntary.

## III.  CONCLUSION

The Court concludes (1) that the initial traffic stop was valid; (2) that Sergeant Ramos did not impermissibly expand the scope of the stop by asking Defendant to exit the vehicle, by conducting a protective frisk, or by searching the vehicle; (3) that the pat-down search of Defendant was justified by Sergeant Ramos's reasonable suspicion that Defendant was armed; (4) that Sergeant Ramos opened the container pursuant to his reasonable belief that Defendant was in immediate danger of a drug overdose; (5) that Sergeant Ramos's actions restraining Defendant did not elevate the encounter into an arrest requiring probable cause; and (6) that the search of the car was permissible based on Sergeant Ramos's fresh suspicion of additional illegal activity and the positive alert by the drug detection dog.  This Court further concludes that Defendant was notified of his Constitutional rights pursuant to Miranda, that the interrogating agents did not ignore an

unambiguous request for an attorney, and that Defendant's waiver of rights was knowing and voluntary.  For these reasons, Defendant's *Motion to Suppress Evidence* [Doc. 42] will be denied.

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion to Suppress Evidence* [Doc. 42] is **DENIED**.

**SO ORDERED** this 25th day of November, 2009, in Albuquerque, New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge